U_____ _____ _____ Court
District of Connecticut
FILED AT NEW HAVEN

August 27 ___ 20 24

By___ S. Santos _____

Deputy Clerk

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ELECTRONIC INFORMATION EXTRACTED FROM A CELL PHONE BY THE PENSACOLA, FLORIDA POLICE DEPARTMENT CURRENTLY LOCATED AT FBI, 600 STATE STREET, NEW HAVEN, CONNECTICUT | Case No. 3:24MJ 752 (MEG) |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Ryan Oates, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search and examination of data extracted from a cell phone seized from Jorge Giovanni ESCOBAR GONZALEZ on or about May 19, 2024 by the Pensacola, Florida Police Department pursuant to a state warrant. The extraction is currently in evidence storage at the Federal Bureau of Investigation (FBI) in New Haven, Connecticut, and the seizure of electronic records and information described in Attachment B.

2.     I am a Special Agent with the FBI and have been since 2016. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent authorized to enforce criminal laws and duly authorized by the Attorney General to request a search warrant. I have participated in investigations involving individuals suspected of interstate transportation of stolen property and other federal offenses. I have written, obtained, and/or coordinated the execution of search and arrest warrants pertaining to individuals involved in various federal offenses. I have prepared or assisted in the preparation of affidavits in

support of applications for search warrants, including warrants for information associated with cellular devices, which have resulted in orders being issued. I have received training in a variety of areas relevant to my position as a Special Agent while at the FBI Academy in Quantico, Virginia.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, § 2314 (interstate transportation of stolen property) and § 371 (conspiracy to commit interstate transportation of stolen property) (collectively, the "Target Offenses") have been committed by ESCOBAR GONZALEZ and others discussed further below. There is also probable cause to search the electronic information described in Attachment A for evidence, instrumentalities, and/or fruits of these crimes as further described in Attachment B.

## IDENTIFICATION OF THE PROPERTY TO BE SEARCHED

5.      The property to be searched is electronic data previously extracted from a cell phone, hereinafter the "**Target Telephone**." The extraction was voluntarily provided to the FBI by the Pensacola, Florida Police Department. A copy of the data extracted from the **Target Telephone** is currently located in evidence at the FBI field office in New Haven, Connecticut.

6.      The applied-for warrant would authorize the examination of the extracted data for the purpose of identifying electronically stored data particularly described in Attachment B.

7.      Though the Pensacola Police Department extracted the data from the **Target Telephone** pursuant to a Florida state court-authorized search warrant signed on May 30, 2024 and filed on June 6, 2024 in a separate investigation, I submit this affidavit and application for a federal search warrant out of an abundance of caution.

## PROBABLE CAUSE

8.      The FBI has been investigating, and continues to investigate, ESCOBAR GONZALEZ and others, both known and unknown to me, for conspiring to steal jewelry and other merchandise from jewelry stores and jewelry store kiosks across the United States. As discussed further below, I believe ESCOBAR GONZALEZ and his co-conspirators ("CC-1, C-2, and CC-4 to -8") (collectively, the "Co-Conspirators," all but one of whom the FBI has identified thus far), as well as others, conspired to commit, attempted to commit, and did commit these burglaries no later than May 2023 and continued through at least April 30, 2024.  After committing the burglaries, I believe ESCOBAR GONZALEZ and his Co-Conspirators then conspired to transport, transmit, and transfer, and did transport, transmit, and transfer the stolen jewelry, valued at more than $5,000, across state lines. The burglaries described below occurred on October 5, 2023 in Milford, Connecticut; on October 27, 2023 in Hamilton Township, New Jersey; on November 4, 2023 in Henrico, Virginia; on April 18, 2024 in Horseheads, New York; and on April 25, 2024 in Newark, Delaware. The total loss from these five burglaries was reportedly approximately $1.28 million to $1.33 million in jewelry. I believe the total actual losses from additional burglaries yet to be identified are likely greater. For example, another jewelry burglary that occurred on or about May 17, 2023 in Paterson, New Jersey, which resulted in approximately $1.5 million in losses, is described below.

3

9.     On July 16, 2024, a grand jury sitting in the Court returned an indictment charging ESCOBAR GONZALEZ and six others with conspiracy to commit the interstate transport of stolen property, in violation of 18 U.S.C. § 371. ESCOBAR GONZALEZ and five of his six co-conspirators others were also charged with a substantive count of interstate transportation of stolen property, in violation of 18 U.S.C. § 2314. ESCOBAR GONZALEZ has been appointed counsel in connection with the case and he is scheduled to appear for an arraignment on August 29, 2024 in sealed Case No. 3:24CR149 (KAD)(RMS). While four of the charged defendants, including ESCOBAR GONZALEZ, have been arrested and/or had a federal detainer filed, three remaining co-defendants remain at large.

10.     By way of additional background, a burglary occurred at the Cordova Mall in Pensacola, Florida on or about April 30, 2024. According to police reports from the Pensacola, Florida Police Department, surveillance video captured the co-conspirators in that burglary of taking nearly $300,000 worth of merchandise from a jewelry kiosk shortly after the kiosk closed, but while the mall was still accessible to the public. The owner of the kiosk indicated that the co-conspirators came to his stand earlier that evening and looked at his merchandise. I have reviewed surveillance video of the burglary and the earlier interactions with the suspects. I recognized ESCOBAR GONZALEZ and another individual ("Co-Conspirator L.S.C.") as the individuals having looked at the merchandise earlier that evening. Based on my participation in this investigation, I recognized ESCOBAR GONZALEZ as one of three male suspects directly involved in the theft later that evening.

11.     Following an investigation by local authorities, on May 19, 2024, ESCOBAR GONZALEZ and Co-Conspirator L.S.C. were located, arrested, and charged with Florida state theft and conspiracy offenses relating to the burglary. The **Target Telephone** was seized

4

incident to the arrest of ESCOBAR GONZALEZ and kept in his property at the jail where he was held. On May 30, 2024, Pensacola Police Department obtained a state search warrant to conduct a search and analysis of the data contained within the **Target Telephone**. A copy of the data extracted from the **Target Telephone** was later voluntarily provided to the FBI and is the property to be searched as described in Attachment A.

12.    In the ongoing federal investigation, as further described below, I believe the Co-Conspirators—including ESCOBAR GONZALEZ—used both their personal telephones and disposable "burner" telephones while planning for, preparing for, and executing the Target Offenses. For reasons described in greater detail below, I further believe that ESCOBAR GONZALEZ has conspired to commit and has committed the Target Offenses with the Co-Conspirators since at least May 2023. As such, I believe that the **Target Telephone**, which reportedly was taken from ESCOBAR GONZALEZ in connection with his pending Florida case, was a telephone used by ESCOBAR GONZALEZ, and that, for additional reasons stated herein, I believe it likely contains evidence of the planning for, preparation for, and execution of the Target Offenses.[1]

### Identification of the 5415 Phone as the Target Telephone

13.    According to financial records, ESCOBAR GONZALEZ used a cellular device with a phone number ending in 5415 ("the 5415 Phone") to send and receive money transfers between at least on or about October 25, 2023 and on or about April 19, 2024. The 5415 Phone

---

[1] To the government's knowledge, the three remaining co-defendants who have not yet been arrested are not aware of the sealed charges against them and thus it is possible that they have attempted to contact the **Target Telephone** even after ESCOBAR GONZALEZ's arrest.

was activated on or about June 29, 2023, and remained active as of June 2024, but had no identifying subscriber information. Based on a comparison of calls made and text messages sent from the 5415 Phone with financial transactions made by ESCOBAR GONZALEZ in his own name, I believe ESCOBAR GONZALEZ was the user of the 5415 Phone. For example, on or about March 31, 2024, ESCOBAR GONZALEZ sent a money transfer using the 5415 Phone to a business recipient just minutes after the 5415 Phone called the recipient. Similar activity of money transfers immediately followed by or preceding calls or text messages to the recipient from the 5415 Phone occurred on or about September 19, 2023 and on or about November 22, 2023.

14.     Pursuant to the court-authorized collection of cell-site location information from the 5415 Phone, I learned that the 5415 had been present in the immediate vicinity of the Pensacola Police Department from June 8, 2024 through June 17, 2024. Accordingly, I believe that the 5415 Phone is the **Target Telephone**.

### Burglary 1 – 1201 Boston Post Road, Milford, Connecticut – 10/5/2023

15.     According to information provided by Milford, Connecticut Police Department, a commercial burglary occurred on October 5, 2023 at a jewelry store kiosk ("Jewelry Store 1") within the Connecticut Post Mall at 1201 Boston Post Road, Milford, Connecticut.

16.     Police conducted interviews of a manager and employee of Jewelry Store 1. In summary, Jewelry Store 1 was closed up at the conclusion of business on October 5, 2023 at approximately 7:24 p.m. When the employee arrived to open the business at approximately 10:09 a.m. the next day, the employee saw that the jewelry cabinets/cases had been broken into. The total loss was reported to be approximately $273,148.84.

6

17.     According to an associated police report, mall security representatives provided police with video of the suspects. This video was later provided to the FBI, which I have reviewed.

18.     At approximately 8:15 p.m., two individuals (CC-1 and CC-2) entered the mall. At approximately 8:19 p.m., two other individuals (CC-5 and CC-6) loitered near the center court in view of Jewelry Store 1. The video available to me did not capture CC-5 and CC-6 entering the mall. At approximately 8:23 p.m., CC-3 (ESCOBAR GONZALEZ) entered the mall through a different entrance. ESCOBAR GONZALEZ carried two cell phones and had what appeared to be earbud headphones in his ears. He walked past Jewelry Store 1. At approximately 8:27 p.m., a fourth individual (CC-4) entered the mall, taking the same path as ESCOBAR GONZALEZ did, then met up with ESCOBAR GONZALEZ. Between 8:28 p.m. and 8:31 p.m., while ESCOBAR GONZALEZ walked to meet CC-4, ESCOBAR GONZALEZ appeared to be manipulating a cell phone. I believe ESCOBAR GONZALEZ's actions were consistent with one who was casing the area.

19.     At approximately 8:33 p.m., ESCOBAR GONZALEZ and CC-4 briefly exited the mall, where they appeared to direct a vehicle ("Vehicle 1") to park in the fire lane near the exit.

20.     Since entering the mall and up until approximately 8:40 p.m., ESCOBAR GONZALEZ and Co-Conspirators 1-6 loitered in the vicinity of Jewelry Store 1, moving between the upper level (with a view of Jewelry Store 1) and lower level, at times coming together and splitting apart. I believe this activity was consistent with casing the jewelry store kiosk and waiting for an opportune moment to burglarize it.

21.     At approximately 8:45 p.m., ESCOBAR GONZALEZ and two other suspects, whom I believe to have been CC-1 and CC-4, approached Jewelry Store 1 carrying three bags.

They approached the counter area and moved out of sight of the camera. CC-2 and CC-6 continued to loiter in the area on the lower level, behaving in manner I believe to have been consistent with acting as lookouts. While this was happening, CC-5 stood on the upper level, looking over the railing toward the jewelry kiosk, keeping watch. While in this "lookout" position, an employee at a nearby shop reported to have overheard CC-5 speak into a cell phone to the effect of "she is leaving now."

22.     At approximately 8:55 p.m., ESCOBAR GONZALEZ, CC-1, and CC-4 departed the counter area of the jewelry kiosk and walked at a quick pace toward the center court. CC-5 then walked down the stairs and joined them. ESCOBAR GONZALEZ and CC-1 were carrying bags of what I believe to have been jewelry stolen from Jewelry Store 1. Prior to reaching the mall exit, ESCOBAR GONZALEZ passed the bag he was carrying to CC-5. All four then walked at a quick pace and occasionally jogged toward the exit and out of the mall. CC-6 followed behind them at a distance and appeared to be talking into her phone.

23.     CC-1, CC-4, and CC-5 left together with the bags of stolen jewelry in a second vehicle ("Vehicle 2") that was waiting for them in another area of the parking lot. ESCOBAR GONZALEZ continued walking past Vehicle 2 and out of camera view to what I believe to have been a third vehicle ("Vehicle 3"). While this was happening, CC-2, who had remained behind as a lookout, then exited the mall through a different exit. While outside the mall, he appeared to be on his cell phone. Though he was lost from camera view, it appeared to me that he may have entered Vehicle 1, which was parked in the fire lane as directed by ESCOBAR GONZALEZ and CC-4.

24.     Criminal history records for ESCOBAR GONZALEZ revealed that he had previously been arrested in Florida for driving without a license in March 2023. I believe the

8

booking photograph for ESCOBAR GONZALEZ from that arrest, pictured below, depicts CC-3 from Burglary 1:



a.                                          *(Burglary 1)*



b.                                          *(March 2023 booking photo)*

25.     Search warrants previously issued by this Court identified four telephones that used cellular towers in the immediate vicinity of Jewelry Store 1 at the time of the burglary ("Telephones 1 – 4"). Telephones 1 – 4 engaged in a conference call with each other for

approximately 25 minutes during the burglary of Jewelry Store 1. Cell site location information and other location information obtained through court-authorized search warrants further showed that Telephones 2 – 4 also used cellular towers during two additional burglaries in other states in October and November 2023 that are part of this investigation. I therefore believe Telephones 1 – 4 were used by ESCOBAR GONZALEZ and his co-conspirators during the execution of the burglary of Jewelry Store 1. Based on my review of subscriber records, call detail records, and data usage, I believe these were "burner" phones, or inexpensive mobile phones designed for temporary, sometimes anonymous, use, after which they may be discarded. In an effort to conceal their identities and the criminal conduct described herein, the Co-Conspirators used burner phones immediately before and during the burglaries and generally did not use their personal cell phones during the burglaries. The Co-Conspirators did, however, use their personal cell phones when not engaged in burglaries.

26.     Through the analysis of call detail records from the burner Telephones 1 – 4, as well as other records (such as financial records and telephone call records), I identified what I believe to be some of the Co-Conspirators' personal telephones, including the personal cell phone for ESCOBAR GONZALEZ. Based on bank records and telephone records, the investigation revealed that ESCOBAR GONZALEZ used the **Target Telephone** at the time of the burglary of Jewelry Store 1.

27.     According to airline records, CC-1 purchased airlines tickets for himself and several other Co-Conspirators, including ESCOBAR GONZALEZ, to fly to New York in the weeks and days before Burglary 1. CC-1 also rented lodging at a residence in Mt. Vernon, New York—located approximately 57 miles away from Milford, Connecticut—for a stay beginning October 1, 2023 for five nights. Cell tower data revealed that shortly before Burglary 1, multiple

Co-Conspirators' phones were in the area of Mt. Vernon. The **Target Telephone**, for example, used cell towers in the area of Mt. Vernon, New York on October 3 and October 5, 2023, the day of Burglary 1.

28.     The investigation revealed that almost immediately after the burglary of Jewelry Store 1, the Co-Conspirators left Connecticut. Cell site location information obtained through a court-authorized search warrant revealed that soon after the burglary, ESCOBAR GONZALEZ traveled into New York, where he made an outgoing call from the **Target Telephone** using a cell tower in Scarsdale, New York at approximately the same time as other Co-Conspirators involved in Burglary 1 also used cell towers in the area. ESCOBAR GONZALEZ's call was placed at approximately 9:58 p.m. local time from a location approximately 50 miles from Jewelry Store 1, after the Co-Conspirators fled the scene of the burglary at approximately 9:00 p.m.

29.     Based on my analysis of cell site location information and other location information obtained through court-authorized search warrants, I believe CC-1 and CC-5, who carried the stolen jewelry out of the mall, also traveled into New York immediately following the burglary, having crossed the border into New York no later than approximately 9:50 p.m.

### Suspected Casing of Malls in the Midwest – 10/13/2023 to 10/17/2023

30.     Analysis of court-authorized collection of historical cell-site location information from telephones believed to be used by the Co-Conspirators, as well as financial records and lodging rental records shows that ESCOBAR GONZALEZ and other Co-Conspirators traveled to Wisconsin on or about October 12, 2023, where they stayed in a short-term rental property rented by CC-1. The **Target Telephone** used cell towers in the vicinity of this rental.

31.     Between on or about October 13, 2023 and on or about October 17, 2023, the Co-Conspirators traveled to multiple malls, sometimes separately, in multiple states. At times, they traveled great distances to visit these malls. For instance, based on the cell-site location records, CC-1 traveled approximately 225 miles from the Wisconsin rental to a mall in or near Coralville, Iowa. While in Iowa, CC-1 visited two other malls before returning to the Wisconsin rental.

32.     Over the following days, the Co-Conspirators visited multiple malls in other states including Indiana, Illinois, and Wisconsin. Cell-site location information showed that the **Target Telephone** accompanied other Co-Conspirators while in Illinois. Though the FBI has not yet identified any burglaries having been committed by the Co-Conspirators during this trip, the Co-Conspirators appeared to have visited one particular mall on multiple occasions in the morning and evening, which I believe indicated they were planning to burglarize a jewelry store there.

### Burglary 2 – Hamilton Township, New Jersey – 10/27/2023

33.     According to information provided by Hamilton Township, New Jersey Police Department, a commercial burglary occurred on October 27, 2023 at a jewelry store kiosk ("Jewelry Store 2") within the Hamilton Mall at 4403 Black Horse Pike, Mays Landing, Hamilton Township, New Jersey. Approximately $365,000 in jewelry was reportedly stolen.

34.     Investigators obtained security video showing two individuals entering the mall at approximately 8:50 a.m. Based on the investigation to date, a review of security video and known photographs, as well as a review of cell phone records and other information, I believe these individuals to be a man, potentially ESCOBAR GONZALEZ, and another woman ("CC-7"). The individual who may be ESCOBAR GONZALEZ and CC-7 had approached the mall after having gotten out of a gray or silver 4-door sedan with missing hubcaps. The driver, who

12

was not visible, remained in the vehicle. At approximately 8:55 a.m., an individual whom I believe to be CC-4 entered the mall through the same entrance, likely having come from a second vehicle deeper in the parking lot. At the time, Jewelry Store 2 had not yet opened for business.

35.     The individual who may be ESCOBAR GONZALEZ, CC-4, and CC-7 met up in the mall near Jewelry Store 2 at a set of massage chairs, then moved away separately. A few minutes later, they congregated near Jewelry Store 2 again. The individual who may be ESCOBAR GONZALEZ appeared to cover a camera on the kiosk, then entered the kiosk while CC-4, CC-6, and CC-7 appeared to act as lookouts. CC-4 and CC-7 appeared to be using cell phones at this time.

36.     At approximately 9:12 a.m., the individual who may be ESCOBAR GONZALEZ quickly walked out of the mall via a different entrance than from where he entered. ESCOBAR GONZALEZ was carrying a large bag that looked to be heavily laden and which I believe contained jewelry stolen from Jewelry Store 2. ESCOBAR GONZALEZ was accompanied by what appeared to be another, as-of-yet unidentified co-conspirator ("CC-8"). CC-7 appeared to calmly move down the escalator from the second floor and left the mall out of the same exit as ESCOBAR GONZALEZ and CC-8. Meanwhile, CC-4 and CC-6 calmly exited the mall from the first entrance, walking past the suspect vehicle deep into the parking lot in the direction from which they originally came. As CC-4 and CC-6 walked past the gray or silver vehicle, it moved quickly around the mall out of view of the security cameras, where I believe it likely picked up ESCOBAR GONZALEZ, CC-7, and CC-8.

37.     According to cell site location records, the **Target Telephone** used a cell tower in the immediate vicinity of Burglary 2 at the approximate time of the burglary.

**Burglary 3 – 1420 N. Parham Road, Henrico, Virginia – 11/4/2023**

38.     According to information provided by Henrico County, Virginia Police District, a commercial burglary occurred on November 4, 2023 at a jewelry store ("Jewelry Store 3") within the Regency Shopping Mall at 1420 N. Parham Road, Henrico, Virginia. Unlike Jewelry Stores 1 and 2 described above, Jewelry Store 3 was an actual store and not a kiosk. Police conducted interviews of the owner and an employee of Jewelry Store 3. In summary, Jewelry Store 3 was closed at the conclusion of business on November 4, 2023 at approximately 6:30 p.m. When the owner and employee arrived to open the business the next morning, they noticed the cash register carts had been moved and a hole in the wall to an adjacent business had been cut, providing access to Jewelry Store 3. The total loss was initially estimated to be between approximately $250,000 and $300,000 in inventory, including jewelry and precious gems.

39.     A representative of the mall provided police with security video showing three individuals leaving the mall at approximately 7:36 p.m. with large dark bags, in a small gray 4-door car with a driver that was waiting. This vehicle matched the description of the vehicle used in Burglary 2. Additional footage showed the same individuals enter the mall at approximately 6:43 p.m., wherein one subject entered first, then waited near the store for an additional male and female. All three individuals walked by the businesses towards a rear service corridor.

40.     Henrico County Police provided the FBI with mall security video of the suspects from the date of the burglary and the day prior. In the video, which did not show the suspects directly in the commission of the burglary, there appeared to be a total of approximately four or five suspects on the evening of November 3, 2023 and approximately four suspects on both the morning and evening of November 4, 2023. Each time, the group of four suspects used the same mall entrance and were observed using what appeared to be the same vehicle. In summary, based

14

on my review of the video and the police report, I believe that the suspects intended to commit the burglary on the evening of November 3, 2023, but were unsuccessful. I believe they then cased Jewelry Store 3 in the morning of November 4, 2023 and committed the burglary that evening.

41.    On November 3, 2023 at approximately 7:01 p.m., three suspects (two males, who I believe to be CC-2 and CC-4; and one female, who I believe to be CC-7) entered the mall. Each appeared to be manipulating what looked like black latex-like gloves on their way into the mall. I believe they likely intended to burglarize Jewelry Store 3 that night due to the fact that they had the gloves prepared with them as they entered the mall that evening, and that they would likely not have had the gloves ready and available if they were simply casing the store. Between 7:04 and 7:05 p.m., they all exited from the same door. A silver or gray small sedan with missing hubcaps was parked in a spot close to the entrance. CC-7 removed what appeared to be an earbud from her ear. At 7:09 p.m., a fourth co-conspirator (who I believe to be CC-1) was depicted loitering on the second floor of the mall, overlooking the first floor. At 7:35 p.m., another suspect, who I believe to have been CC-6, loitered in the mall on her cell phone.

42.    On November 4, 2023 at approximately 9:56 a.m., what appeared to be the same small silver or gray sedan with missing hubcaps parked in a different spot but close to the same entrance to the mall. CC-4 got out of the car and entered the mall. After a short while, CC-2 and CC-7 got out of the car and entered the mall together. A fourth co-conspirator remained in the car. CC-7 appeared to be using a cell phone.

43.    On November 4, 2023 at approximately 6:43 p.m., CC-2 entered the mall and appeared to wait for CC-4 and CC-7 to meet up with him. CC-2, CC-4, and CC-7 then walked together through the mall. Between approximately 7:35 p.m. and 7:36 p.m., what appeared to be

the same small silver or gray sedan with missing hubcaps parked in a different spot but close to the same entrance to the mall. I observed a driver in the car. CC-2, CC-4, and CC-7 walked quickly out of another exit from the mall toward the waiting car. The driver opened doors of the car to allow them in. Two of the co-conspirators were carrying large bags that appeared to contain heavy contents. CC-7 and one of the other two co-conspirators appeared to be using cell phones. The driver and CC-2, CC-4, and CC-7 got into the car and quickly left the parking garage. As they were leaving, bystanders exited the mall and watched the car leave while calling attention to it by pointing at it. Once the car was out of the garage, the bystanders when back into the mall. I believe these bystanders may have witnessed part of the burglary.

44.     What appeared to be the same co-conspirators were seen on November 3, 2023 during the morning and evening of November 4, 2023 as described above. The co-conspirators had similar physical characteristics and wore the same or similar clothes. Moreover, the co-conspirators were using what appeared to be the same car the morning and evening of November 4, 2023, and what I believe to be the same car was partially visible near the co-conspirators on the night of November 3, 2023. Additionally, the clothing and physical descriptions of the co-conspirators were very similar from each of the described time periods on November 3 and November 4, 2023.

45.     According to financial records, ESCOBAR GONZALEZ was in the general area of the burglary and lodging rental during the same timeframe as the other Co-Conspirators. Cell site location records showed the **Target Telephone** used cell towers in the same general areas and times as other Co-Conspirators on their way back from Virginia to New York on November 5, 2023, during which time I believe the stolen jewelry was transported across state lines.

16

### May 2023 Burglary in Paterson, New Jersey

46.     As discussed in paragraph 24 above, criminal history records for ESCOBAR GONZALEZ revealed that he had been arrested in Florida for driving without a license in March 2023. I believe the booking photograph from that arrest, pictured in paragraph 24b above, appears to depict CC-3 (ESCOBAR GONZALEZ) from Burglary 1, as shown in paragraph 24a above.

47.     The vehicle that ESCOBAR GONZALEZ had been driving in Florida when he was arrested in March 2023 was later observed on or about May 10, 2023 in Paterson, New Jersey, making multiple passes of a jewelry store. The occupants of the car, believed to be a man and woman, allegedly pointed at the store owner as they left. Approximately seven days following that incident, the jewelry store was burglarized by four masked individuals resulting in the theft of approximately $1.5 million worth of gold and jewelry, according to news reports. One of the co-conspirators in this burglary was a larger individual, who I believe was CC-1 based on a review of surveillance video and other information obtained from the local investigation into that burglary.

48.     I therefore believe evidence of the May 17, 2023 Paterson, New Jersey burglary may be found in the data extracted from the **Target Telephone**.

### Burglary 4 – Horseheads, New York – 4/18/2024

49.     More recently, investigators have become aware of additional burglaries of jewelry retail stores involving some of the same suspects and methods as described above.

50.     According to information provided by the New York State Police, a burglary occurred at a jewelry store in Horseheads, New York on or about April 18, 2024. The burglars broke into an empty storefront next to the jewelry store, then broke through the wall to enter the

17

jewelry store, stealing approximately $396,619 in jewelry from the store. Notably, this was a similar *modus operandi* to Burglary 3. Earlier in the day, three Hispanic suspects went into the jewelry store for a short time before leaving, speaking only Spanish. I reviewed security surveillance images from earlier in the day and recognized one of these individuals as ESCOBAR GONZALEZ and a woman I believe is a known associate of ESCOBAR GONZALEZ (Co-Conspirator L.S.C.). Additionally, I viewed a photograph of a gray vehicle that was believed to have been involved, which appeared to be a Nissan Versa.

51.     According to police records, Co-Conspirator L.S.C. was with ESCOBAR GONZALEZ when he was arrested previously in Florida in March 2023, as described above, just two months before that vehicle was observed what I believe to have possibly been casing the jewelry store in Paterson, New Jersey. Co-Conspirator L.S.C. was also with CC-1 during his October 2021 arrest in Nevada.

52.     According to cell site location information, a telephone used by CC-1 (the "0706 Phone") was present in the immediate vicinity of the April 18, 2024 burglary at the time during which the burglary was believed to have occurred. Following the burglary, the 0706 Phone traveled directly to New York City, New York via New Jersey. Accordingly, there is reason to believe that the user of the 0706 Phone—CC-1—was also involved in Burglary 4 and the subsequent transportation of stolen jewelry across state lines.

### (Attempted) Burglary 5 – Newark, Delaware – 4/25/2024

53.     According to information provided by security employees at a mall in Newark, Delaware, in the evening of April 25, 2024 just after mall closing, mall security noticed a group of three males and one female (who did not appear to be Co-Conspirator L.S.C.), one of whom was carrying a large bag. The security employee was suspicious of their presence because they

were all congregating around one wing after mall closing and were on their cell phones but were not talking. The security employee approached them to ask if they needed assistance. They did not acknowledge the offer and avoided eye contact. They then left the property separately in different directions as they exited the mall. A gray vehicle seemed to accompany the group and departed the property in the same direction as the group, who left the property on foot. Images of two of the suspects that I have reviewed matched the descriptions of CC-1 and CC-5. What I believe to have been an attempted burglary was unsuccessful and nothing was taken at the time.

54.     According to cell site location information, the **Target Telephone** used cell towers in the immediate vicinity of the Newark mall on April 25, 2024. I therefore believe that ESCOBAR GONZALEZ was involved in the attempted burglary.

55.     Based on my review of cell site location information from the 0706 Phone used by CC-1, I know that the 0706 Phone used cellular towers in the immediate vicinity of the Newark mall on the date and timeframe the suspects were observed, as well as that morning and the day prior. Further investigation revealed the vehicle to have been a gray Nissan Versa with a particular Virginia license plate. The suspect vehicle from the April 18, 2024 New York burglary also matched the description of this gray Nissan Versa.

56.     Based on my involvement in this investigation and through the execution of search warrants, I have learned that the co-conspirators involved in the Target Offenses as described herein, have exchanged text messages and audio messages regarding the Target Offenses, have taken and exchanged photographs and videos of locations along the way between burglaries, have taken photographs of themselves wearing jewelry I believe may have been stolen from one of the victim stores, have taken their personal cell phones and "burner" phones

with them during the planning for, preparation for, and execution of the Target Offenses, and have conducted internet searches for victim stores.

57.     Therefore, based on the means and methods used by the co-conspirators to plan for, prepare for, and execute the Target Offenses as described herein, I believe that the data extracted from the **Target Telephone** likely contains evidence of the Target Offenses. This evidence will likely include (but is not limited to) location information, photographs and videos relevant to Target Offenses (i.e. photographs and/or videos of locations where the co-conspirators resided along the trip from state to state, of co-conspirators, of potential victims, and of stolen property), communications between co-conspirators and others regarding the Target Offenses, contact lists identifying co-conspirators, internet search histories, and financial records.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

58.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

59.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Telephone** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Target Telephone** because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on the **Target Telephone** is evidence may depend on other information stored on the device and the application of knowledge about how such a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

60. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the data already extracted from the device consistent with the warrant.

61. *Manner of execution.* Because this warrant seeks only permission to examine property already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## AUTHORIZATION REQUEST

62. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to Federal Rule of Criminal Procedure 41.

Respectfully submitted,

**RYAN OATES** Digitally signed by RYAN OATES
Date: 2024.08.27 07:29:37 -04'00'

RYAN OATES
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me by telephone on August 27, 2024

HON. MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

The property to be searched is electronic data previously extracted from a cell phone, hereinafter the "Target Telephone." The extraction was voluntarily provided to the FBI by the Pensacola, Florida Police Department. A copy of the data extracted from the Target Telephone is currently located at the Federal Bureau of Investigation in New Haven, Connecticut.

This warrant authorizes the examination of the electronic information already extracted from the Target Telephone for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

## Particular Things to be Seized

1.    All records from the extracted data described in Attachment A that relate to violations of Title 18 United States Code § 2314 (interstate transportation of stolen property) and § 371 (conspiracy to commit interstate transportation of stolen property) and involving Jorge Giovanni Escobar Gonzalez and his co-conspirators from May 1, 2023 through May 30, 2024, including, but not limited to:

   a.   Evidence of the planning for, preparation for, and execution of the Target Offenses;

   b.   Evidence of the jewelry burglaries or attempted burglaries on or about May 17, 2023 in Paterson, New Jersey; October 5, 2023 in Milford, Connecticut; between October 13, 2023 and October 17, 2023 in Illinois, Iowa, Indiana, and Wisconsin; on October 27, 2023 in Hamilton Township, New Jersey; on November 3, 2023 and November 4, 2023 in Henrico, Virginia; on April 18, 2024 in Horseheads, New York; and on or about April 25, 2024 in Newark, Delaware;

   c.   Evidence of the location or disposition of stolen goods from the Target Offenses, including financial records;

   d.   Evidence of the locations of the co-conspirators and any associates during the planning for, preparation for, and execution of the Target Offenses;

   e.   Evidence tending to identify co-conspirators, victims, and witnesses of the Target Offenses;

   f.   Evidence indicating how and when the device was accessed or used, to determine the geographic and chronological context of device access, use, and events relating to the crimes under investigation and the device's owner;

g. Evidence indicating the device owner's state of mind as it relates to the crimes under investigation; and

h. The identity of the person(s) who used the device, including records that help reveal the whereabouts of such person(s);

2. Evidence of user attribution showing who used or owned the Target Telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronically stored information already seized or copied in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3